FILED

2012 Jun-15  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ANDRE MURRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-10-S-2056-NE |
| | ) | |
| KOHLER CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Andre Murrell, commenced this action against his former employer, Kohler Co, Inc., alleging that defendant terminated his employment in retaliation for filing grievances with his union, complaining to his superiors, and filing a charge with the Equal Employment Opportunity Commission, all alleging that defendant allowed him to be subjected to sexual harassment by a female supervisor.[1]  The underlying claim of sexual harassment is the subject of a separate suit, *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, that plaintiff filed in this court on October 23, 2009.[2]  The present action is before the court on a motion for summary judgment and a related motion to strike, both of which were filed by defendant.[3]  Upon

---

[1] Doc. no. 1 (Complaint) ¶¶ 11-23.  These allegations are based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

[2] *See* Part II(F) *infra* (detailing the procedural history of this suit and the related suit, *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE).

[3] Doc. no. 27 (Motion for Summary Judgment); doc. no. 37 (Motion to Strike).

consideration of the motions, briefs, and evidentiary submissions, the court concludes that summary judgment is due to be entered in favor of defendant on all claims, and that the motion to strike is due to be denied as moot.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'"  *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir.

---

[4] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  FACTS AND PROCEDURAL HISTORY[5]

The Kohler Company owns and operates a manufacturing facility in Huntsville, Alabama, that produces fiberglass bathtubs and shower stalls.[6]  Defendant employs approximately 350 individuals at that plant.[7]  Plaintiff, an African-American male, was initially employed by defendant from 2000 to 2001, but left his position to pursue a job with a different employer.[8]  Plaintiff was rehired by defendant in 2002, and

---

[5] *Note*:  as discussed above and in greater detail in Part II(E) *infra*, this action has a companion case, *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, in which plaintiff asserted other claims arising out of his employment with defendant.  All citations to the record herein, unless otherwise indicated, are to the record in the present case, *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-10-S-2056-NE.

Also, three different depositions of plaintiff are cited herein.  Plaintiff's deposition in this case began on April 27, 2011.  Due to the severe weather and tornadoes that ravaged Alabama that day, however, the deposition ended prematurely and was reconvened on May 12, 2011.  *See* doc. no. 29-2, Vol. 1 (Plaintiff's First Deposition), at 5; *id.* at 81 ("The Sheriff's department is recommending evacuation for us."); doc. no. 29-2, Vol. 2 (Plaintiff's Second Deposition), at 88-89 ("I will just go ahead and put on the record that we had to adjourn rather quickly due to a tornado situation in the last deposition on April 27th, so we are resuming the deposition today.").

Because plaintiff's deposition ended and then was reconvened, document number "29-2" contains two deposition transcripts, labeled "Volume 1" and "Volume 2," respectively, and each volume has separate pagination.  Therefore, for purposes of citations to the record in this opinion, document number "29-2" is split into two separate documents by volume — "doc. no. 29-2, Vol. 1 (Plaintiff's First Deposition)" and "doc. no. 29-2, Vol. 2 (Plaintiff's Second Deposition)" — and the citations to those depositions are to the deposition transcript page numbers in each.

Additionally, plaintiff's deposition in the related suit, *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, was submitted as evidence by defendant, and it is cited herein as "doc. no. 29-1 (Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE)."

[6] *See* doc. no. 28 (Brief in Support of Motion for Summary Judgment), at 3; doc. no. 34 (Response in Opposition to Motion for Summary Judgment), at 1.

[7] Response in Opposition to Motion for Summary Judgment, at 1.

[8] *See* Brief in Support of Motion for Summary Judgment, at 3; Response in Opposition to Motion for Summary Judgment, at 1.

remained employed by defendant until his termination on November 21, 2007.[9]

Plaintiff was primarily engaged as a "Molding Operator" on the "B shift," the second

of four rotating twelve-hour shifts.[10]  In addition to his work on the "B shift," plaintiff

worked overtime hours on the "D shift" as often as four days a week.[11]  As a "Molding

Operator," plaintiff utilized a press machine to mold fiberglass into bathtubs and

shower stalls.[12]  "B shift" employees worked 12 hour shifts *either* from 7:00 a.m. to

7:00 p.m. *or* from 7:00 p.m. to 7:00 a.m for three days and then would have three days

off work.[13]  The "B shift" worked the day shift (7:00 a.m. to 7:00 p.m.) three days on

and three days off for three to four weeks, then rotated to the night shift (7:00 p.m. to

7:00 a.m.) three days on and three days off for three to four weeks before rotating

back to the day shift.[14]

## A.    Defendant's Policies

When plaintiff began his employment with defendant, he was required to attend

---

[9] *See* Brief in Support of Motion for Summary Judgment, at 3; Response in Opposition to Motion for Summary Judgment, at 1.

[10] *See* doc. no. 29-1 (Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE), at 58-62, 74, 77.  The only other position plaintiff held with defendant was "Operator Assistant," which is a temporary training position he held for a short time immediately after he was hired.  *See id.* at 58-59.

[11] *Id.* at 76-77.

[12] *Id.* at 59-62.

[13] *Id.* at 74-75, 82.

[14] *Id.* at 74-75.

an orientation seminar at which defendant's employment policies were explained.[15]

He also received copies of the employee handbook, plant rules, and orientation

materials that covered defendant's policies.[16]  During his deposition, plaintiff testified

that, after completing the orientation and receiving the materials, he understood

defendant's policies.[17]   Three of those policies are important to the resolution of

defendant's motion for summary judgment:  the "Absence System," "No-Call," and

"Family and Medical Leave Act (FMLA)" policies.

**1.     The Absence System policy**

Defendant's "Absence System Policy" provides:

ABSENCE SYSTEM POLICY

The absence system includes three types of absenteeism:

1.     <u>No-calls</u> – This system is outlined in detail in the No-Call
       policy.

2.     <u>Absences</u> – It is each employee's responsibility to be at
       work when scheduled.  Being absent from work may be
       cause for disciplinary action.

3.     <u>Occurrences</u> – A reported off absence is an occurrence.
       The symbols shown below are used to determine if an

---

[15] Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 65-66.

[16] *Id.* at 65-73; *see also id.* at Ex. 5 (Form Acknowledging Receipt of Handbook and Signed by Plaintiff) and Ex. 6 (Hourly Employee Handbook); doc. no. 29-2, Vol. 1 (Plaintiff's First Deposition), at 35 (acknowledging receipt of the employee handbook).

[17] Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 66-67.

occurrence has taken place and also the point value of the occurrence.  Consecutive days absent for the same reason is considered a multiple day occurrence.

| Event | Occurrence |
|---|---|
| Absent – one day only (A) | 1 |
| Absent – multiple consecutive days (AA) | 1.5 |
| Late Arrival (L) | 0.5 |
| Leave Early (LE) | 1 |
| Leave & Return (LR) – under 4 hours | 0.5 |
| Leave & Return (LR) – over 4 hours | 1 |
| Funeral Leave (F) | 0 |
| Jury Duty (J) | 0 |
| Voluntary Furlough *(VF) | 0 |

*Voluntary Furlough – Permission obtained from the supervisor before the absence occurs and which causes no compromise of production.

*If a person arrives after 1:00 p.m./a.m., they are to be sent home and it will be counted as an absence.  If at 1:00 p.m. on the nose, it will be a judgment call – if they are needed, keep them, if not, count it as an absence and send them home.

Notification will be:

1.    Absentee Notice #1 – Issued after a minimum of six (6) occurrences within a rolling 12-month period.

2.    Absentee Reprimand #2 – One-day suspension – Issued after a minimum of eight (8) occurrences within a rolling 12-month period.

3.    Absentee Reprimand #3 – 4 day suspension pending termination investigation – Issued after a minimum of nine (9) occurrences.

Multiple absence points will work off in the following manner:

7

> When only one day of the multiple absence remains in the 12-month period, .5 occurrence will become inactive. When the final day is outside the 12-month window the remaining 1 occurrence will become inactive.[18]

In summary, an absence is defined as any period of time that an employee does not report for a scheduled shift.[19] The "Absence System" is a point based system, in which an employee is assigned points (called "occurrences") for different types of absences, and employees are disciplined based on the number of points accumulated.[20] Each point accumulated by an employee remains on his or her record for one year, and then is removed.

### 2.    The No-Call policy

Defendant's "No-Call" policy is distinct from the "Absence System" policy, and it is described in the employee handbook as follows:

NO-CALL POLICY

NO-CALL – Failure to report off from work at least one hour prior to the start of the scheduled shift.

Due to the uncertainty and confusion that is caused by a "no-call" and the unfair burden it places on other employees if we are required to work "short," a "no-call" is a serious offense and is cause for disciplinary action.

---

[18] Doc. no. 29-1, Defendant's Ex. 6 (Employee Handbook), at 4 (emphasis in original).

[19] *Id.*

[20] *See* doc. no. 29-3 (Deposition of Becky McCutcheon), at 55-56.

8

If an employee fails to report off for three consecutive work days he/she will be considered to have abandoned their job and will be considered a voluntary quit.  Where an employee has "just cause" for failure to report off due to an emergency, the case will be reconsidered.

NO-CALL DISCIPLINARY PROCEDURE:

1.   No-call counseling #1 – Issued for the first no-call violation in a 12-month period.

2.   No-call counseling #2 – Issued for the second no-call violation in a 12-month period.

3.   No-call reprimand #3 – One day suspension – Issued for the third no-call violation in a 12-month period.

4.   No-call reprimand #4 – 4 day suspension pending termination investigation – Issued for the fourth no-call violation in a 12-month period.

However, an employee who —

1.   Calls <u>no less than</u> 30 minutes prior to the start of the shift <u>*and*</u>

2.   Arrives no more than 60 minutes late for his/her scheduled shift

Will not receive a no-call write up.

<u>Both</u> criteria must be met to avoid a no-call write up.  However, one full occurrence will automatically result (½ occurrence for calling late, and ½ occurrence for arriving late) if the no-call write up is not given.

If both criteria are not met, a no-call write up will be given for calling late and ½ occurrence will be given for arriving late.[21]

---

[21] Employee Handbook, at 5 (emphasis in original).

The "No-Call" policy is effectuated through a "call-off" telephone line that goes directly to an answering machine in the plant.[22]   The process of calling that telephone number and leaving a message is referred to by the management and employees as a "call-off."  Supervisors monitor the answering machine each day, and log all messages into a notebook.[23]  The names of employees who are absent from work, but who did not call the "call-off" line are also written in the notebook.[24]

As previously noted, the "No-Call" policy is a separate accounting system from the "Absence System" policy, although the "No-Call" does provide for some "no-call" events to feed in to the absence points system.  The "No-Call" policy defines a "no-call" violation as the failure to telephone the "call-off" line and "report off from work *at least one hour prior* to the start of the scheduled shift."[25]  The policy provides a standard disciplinary procedure and three exceptions to the standard procedure.  The standard disciplinary procedure provides that, each time an employee violates the "No-Call" policy by failing to telephone the "call-off" line at least one hour prior to the start of his or her shift *and* failing to report to work that day, the employee receives a disciplinary action of either a counseling or reprimand.  Following a fourth

---

[22] McCutcheon Deposition, at 66.

[23] *Id.*

[24] *Id.* at 67.

[25] Employee Handbook, at 5 (emphasis supplied).

"No-Call" violation in a twelve-month period, the employee is suspended from employment pending termination.[26]

The "No-Call" policy provides a harsher disciplinary procedure for consecutive violations. If an employee violates the policy on three consecutive days, he or she is deemed to have abandoned his or her job and is terminated.[27]

The "No-Call" policy provides an exception to discipline when the employee telephones the "call-off" line at least 30 minutes prior to the start of the employee's shift *and* arrives at work no more than 60 minutes after the start of the employee's shift.[28] However, that exception is linked to the "Absence System" policy because when an employee meets the exception to the "No-Call" policy, the employee is given a full occurrence under the "Absence System" policy.[29]

Finally, if an employee calls late and arrives to work late, but does not meet the criteria for the previous exception, the employee receives a "no-call write up": *i.e.*, a counseling or reprimand for *calling* late, and a half occurrence point under the "Absence System" for *arriving* late. For example, that exception would apply if an employee telephoned the "call-off" line forty-five minutes prior to the start of his

---

[26]*See* Employee Handbook, at 5; *see also* McCutcheon Deposition, at 56.

[27] *See* Employee Handbook, at 5.

[28] *See id.*

[29] *See id.*

shift, and, arrived fifty-five minutes after the start of his shift.

### 3.    The Family and Medical Leave Act policy

Defendant also has a Family and Medical Leave Act ("FMLA") policy.  The

part relevant to plaintiff's claim reads:[30]

> NOTICE REQUIREMENTS:
> An employee requesting FMLA leave must make such request in writing
> and must provide the anticipated timing, duration, and reason for the
> leave (forms are available in HR for this purpose).  When leave is
> foreseeable for childbirth, placement of a child or planned medical
> treatment for the employee's or family member's serious health
> condition, the employee must provide Kohler with at least 30 days
> advance notice, or such shorter notice as is practicable (*i.e.*, within 1 or
> 2 business days of learning of the need for the leave.)  If an employee
> fails to give proper notice for foreseeable FMLA leave, the leave may be
> denied until 30 days after the date the employee provides notice of the
> need for FMLA leave.  Employees applying for leave are required to
> show medical certification to support a claim for family medical leave.

> Except as necessary to comply with the FMLA, Kohler's leave policy
> remains unchanged.  An eligible employee who requests leave under the
> provisions of the FMLA must comply with the notice requirements of
> the FMLA as well as other company policies, as described below.

> . . .

> MEDICAL CERTIFICATION
> An employee will be required to furnish medical certification and/or
> periodic re-certification of the need for FMLA leave due to a serious
> health condition of the employee or the need to care for a family member
> with a serious health condition as defined in the FMLA.  Such

---

[30] The following policy was crafted in order to comply with the Family and Medical Leave
Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654.

certification may be required prior to FMLA leave approval; or while on FMLA leave if the conditions surrounding the leave change and appropriateness of the leave is [*sic*] in question; or after FMLA leave is exhausted and the employee is unable to return to work.  Failure to furnish the appropriate certification within 15 days of a management request, or as soon as reasonable, may result in leave denial until proper certification is provided.  All medical certification documents will be maintained in separate confidential medical files and treated with strict confidentiality.[31]

### 4.      Interplay between the No-Call and FMLA policies

An employee who is granted FMLA leave is not required to "call-off" and, thus, cannot be disciplined for violating the "No-Call" policy while on *approved* FMLA leave.[32]  Nevertheless, an employee who has not returned the required FMLA medical certification *is* required to "call-off" until the medical certification is submitted and defendant has approved the employee's FMLA leave request.[33]

### B.      Protected Activities

Plaintiff filed grievances through his union representatives on April 12, August 11, August 15, and August 22, 2007, all of which asserted that he had been sexually

---

[31] Employee Handbook, at 22-23.

[32] *See* doc. no. 34 (Response in Opposition to Motion for Summary Judgment), at 4 ("Kohler Company policy does not require employees to telephone the call-off line when exercising leave pursuant to the Family and Medical Leave Act."); doc. no. 36 (Reply Brief in Support of Motion for Summary Judgment), at 1 (not contesting that statement of fact), and 6 ("The fact that an employee on FMLA leave is not required to call in to report his absences . . . .").

[33] *See* doc. no. 29-2, Vol. 1 (Plaintiff's First Deposition), at 41 ("I was told by Denise Robinson — and Becky to always call in.  So you have to call in, and you have to have your paper back in 15 days.").

13

harassed by Shayla Bennett, a fellow employee and shift supervisor in the Huntsville plant.[34]   Plaintiff also reported to members of defendant's management on three additional dates in 2007 — *i.e.* June 28, July 24, and August 9 — that he was being sexually harassed by Bennett[35]

As a result, Ms. Bennett received a three-day suspension without pay on August 20, 2007.[36]   Seven days later, she was informed that she was to remain on unpaid suspension without pay until defendant's investigation into plaintiff's complaints of sexual harassment was completed, and a "decision is made regarding future employment."[37] Shayla Bennett resigned her position on September 6, 2007, however, without waiting for the outcome of the investigation.[38]

Even so, plaintiff still filed a charge with the Equal Opportunity Employment Commission on October 9, 2007, alleging that he had been subjected to sexual harassment.[39]

## C.   FMLA Leave

---

[34] Doc. no. 29-2, Vol. 2 (Plaintiff's Second Deposition), at 100-01, 112, 115.

[35] *Id.* at 104-08.

[36] *See* Appendix A, at 2 (Bates stamped "0306").

[37] *Id.* at 3 (Bates stamped "0304").

[38] *Id.* at 4 (Bates stamped "0303"); *see also* doc. no. 29-3 (Deposition of Becky McCutcheon), at 20.

[39] Doc. no. 29-2, Vol. 2 (Plaintiff's Second Deposition), at 137-38; *id.* at Defendant's Ex. 8 (EEOC Charge of Discrimination).

Plaintiff learned on November 6 or 7, 2007 that he needed to have surgery on his feet, and that the procedure was scheduled to occur on November 13, 2007.[40]  He immediately sought FMLA leave.[41]  Plaintiff testified that he mailed a letter to Ross Ingram, the manager of manufacturing at the Huntsville facility, on November 7, 2007, stating that:

> I have been informed by my physician Dr. Edward Behmer that I will need surgery on my feet.  My surgery is scheduled for November 13, and I will be off work until my doctor releases me.  I know that I need to fill out my Family Medical Leave paperwork from Becky McCutcheon in Human Resources.  If there is anything else I need to do before my leave, please inform me immediately so that I can take care of it before my surgery.  Thank you for your understanding in this matter, and I look forward to returning back to work after my surgery.[42]

Plaintiff also said that he mailed a carbon copy of that letter to Rebecca ("Becky") McCutcheon, the Manager of defendant's Human Resources Department.[43]  Defendant maintains, however, that neither Ross Ingram nor Becky McCutcheon received a letter from plaintiff.[44]

In any event, plaintiff met with McCutcheon and Denise Robinson, the Human

---

[40] Doc. no. 29-1 (Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE), at 226.

[41] *Id.* at 228-29.

[42] Doc. no. 29-1, Defendant's Ex. 18 (Letter to Ross Ingram); *see also* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 253-56.

[43] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 256.

[44] *See* Deposition of Becky McCutcheon, at 48-49.

Resources Coordinator, on November 9, 2007.[45]  Plaintiff testified that he informed both individuals of his surgery and the date it was scheduled to occur.  He also requested a copy of defendant's standard FMLA medical certification forms.[46] Defendant required employees to submit a medical certification within fifteen days *of*

---

[45] *Id.* at 227-29.

[46] Plaintiff testified as follows concerning his relevant interaction with McCutcheon and Robinson on November 9, 2007:

> Q    And how did you come to be talking with Becky McCutcheon and Denise Robinson?
>
> A    I went to the office for family medical leave papers.
>
> Q    Tell me, how did the conversation take place?  I mean, were you talking to both of them?  They were both there or were you talking to one or the other? How did it work?
>
> A    They were both there.
>
> Q    What did you say and what did they say?
>
> A    I came in and asked for family medical leave papers for my surgery and showed them my feet.
>
> A    Was the surgery scheduled at that point?
>
> A    Yes.
>
> Q    Did you tell them when the surgery was going to be?
>
> A    Yes.
>
> Q    You understood that you had 15 days to return [the medical certification forms]?
>
> A    Yes.

Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 228-29.

"*a management request*" for FMLA leave, or it was subject to denial.[47]    Ms.

McCutcheon reminded plaintiff of that policy requirement, and he acknowledged that

he understood the need for a medical certification to be submitted within fifteen

days.[48]    The record is unclear on this issue, however:  *i.e.*,  whether plaintiff was

required to return the medical certification within fifteen days *of the date he spoke to*

*McCutcheon and Robinson and requested FMLA forms* (November 9, 2007), or within

fifteen days *of the date of his surgery* (November 13, 2007).  Even so, it appears from

the following testimony of Ms. McCutcheon that defendant viewed the event which

triggered the beginning of defendant's fifteen-day reporting requirement as the date

on which plaintiff's physician told plaintiff that surgery was necessary, and informed

him of the scheduled date for the surgical procedure.

> He came in and said he needed family medical leave paperwork
> because he was going to have surgery done.  I pulled the paperwork out
> for him.  I asked him if his surgery had been scheduled.  He said, no.  *I*
> *said*, well, *when you get it scheduled, then you have 15 days to provide*
> *this paperwork back to us*, *and that was pretty much the whole*
> *conversation*.  He hadn't had it scheduled, so there wasn't — it's not
> unusual for somebody to come in proactively and get paperwork prior to
> having, you know, a procedure scheduled or they just know that they're
> going to be seen.  They want to take the paperwork with them, and it
> may be scheduled at the appointment or some times [*sic*] they get it and

---

[47] Employee Handbook*,* at 23 (emphasis supplied); *see also* Plaintiff's Deposition in Civil
Action No. CV-09-S-2156-NE, at 70-72 (acknowledging that the Employee Handbook stated the
defendant's FMLA policy).

[48] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 228-29; McCutcheon
Deposition, at 52.

they don't even use it.[49]

Importantly, plaintiff admitted that McCutcheon and Robinson also told him that he must "call-off" each day he was scheduled to work until he turned in the medical certification:  "I was told by Denise Robinson — and Becky [McCutcheon] to always call in.  So you have to call in, and you have to have your paper back in 15 days."[50]

Plaintiff underwent surgery on November 13, 2007, but he did not submit the medical certification required by defendant's FMLA policy until November 29, 2007: *i.e.*, 22 days after he alleges that he mailed the letters requesting FMLA leave to Ross Ingram and Becky McCutcheon; 20 days after he requested the FMLA paperwork from McCutcheon and Denise Robinson; and 16 days after his surgery.[51]

## D.    Termination of Employment

On the date plaintiff was terminated, he was assigned to work the "B shift" from 7:00 a.m. to 7:00 p.m., three days on and three days off, but not on Sundays.[52]  The last day on which plaintiff worked that shift prior to his surgery was November 10,

---

[49] McCutcheon Deposition, at 51 (emphasis supplied).

[50] Doc. no. 29-2, Vol. 1 (Plaintiff's First Deposition), at 41 (alteration supplied).

[51] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 225-26, 230-31; McCutcheon Deposition, at 52; Brief in Support of Motion for Summary Judgment, at 7; Response in Opposition to Motion for Summary Judgment, at 4.

[52] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 225.

2007.[53]  He was scheduled to next work on November 15, 16, and 17, and then again on the November 21, but he never returned to work.[54]

Plaintiff asserts that he placed telephone calls to the "call-off line" on November 15, 16, and 17, and left messages on the answering machine stating his name, other identifying information, and that he would be off-work that day due to the surgery performed on November 13.[55]

Defendant disputes that assertion, saying that plaintiff failed to either show-up for, or "call-off" work pursuant to the "No-Call" policy on three consecutive days — November 15, 16, and 17, 2007.[56]  Additionally, plaintiff had a "no-call" violation within the previous twelve months (July 30, 2007), because he failed to call in more than an hour before his shift started.[57]

Defendant terminated plaintiff's employment for "job abandonment" pursuant to the "No-Call" policy on November 21, 2007.[58]  The decision to terminate plaintiff's employment was made by John Kyle (the plant manager and most senior employee

---

[53] *See id*. at 225-26.

[54] *See id*. at 239-40.

[55] *See id*. at 241-42.

[56] *See* doc. no. 29-5 (Second Declaration of Becky McCutcheon) ¶ 8.

[57] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 224; Plaintiff's Second Deposition, at 136.

[58] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 223-24; *see also* doc. no. 29-1, Defendant's Ex. 16 (Termination Letter).

at the Huntsville facility), Ross Ingram (manager of manufacturing), and Becky McCutcheon (HR manager).[59]

Plaintiff finally contacted defendant by placing a telephone call to Ross Ingram on December 3, 2007 — *i.e.*, 26 days after he allegedly mailed the letters requesting FMLA leave to Ross Ingram and Becky McCutcheon, 24 days after he requested FMLA paperwork from McCutcheon and Denise Robinson, and 20 days after his surgery — and learned that his employment had been terminated.[60]  During that telephone call, Ingram told plaintiff that, if he could provide telephone records within one week showing that he had complied with the "no-call" policy, his termination would be reconsidered.[61]  Plaintiff failed to provide Ingram or any other management official copies of his telephone records, however.[62]  Instead, plaintiff did not produce his telephone records for the relevant time period until discovery in the present case. The records did not help plaintiff, however, because they showed that he called the "call-off" line nearly one-and-a-half hours *after* the beginning of his 7:00 a.m. shift on November 15, 16, and 17, 2007 — *i.e.,* at 8:24 a.m. on November 15, at 8:50 a.m.

---

[59] *See* McCutcheon Deposition, at 68.

[60] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 243-46; McCutcheon Deposition, at 68-70.

[61] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 244; McCutcheon Deposition, at 69-70.

[62] *See* Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 244; McCutcheon Deposition, at 69-70.

on November 16, and at 8:38 a.m. on November 17 — and that he did not call the "call-off" line at all on November 21st.[63]

Plaintiff's treating physician did not medically clear plaintiff for return to work until January 29, 2008.[64]  Plaintiff admitted, nevertheless, that, even after that date, he was physically unable to perform the required duties of his prior position as a Molding Operator.[65]  In February of 2008, plaintiff worked for two weeks packing boxes for another employer — a job less strenuous than operating one of defendant's press machines.[66]  Even so, plaintiff was forced to quit that job because he was physically unable to perform the work.[67]

Plaintiff has been disabled and completely unable to work since he had knee replacement surgery in July of 2008.  That same month he filed for Social Security disability benefits, which he currently receives.[68]

E.    **Procedural History**

Plaintiff filed a charge with the Equal Employment Opportunity Commission on October 9, 2007, claiming that defendant had subjected him to sexual harassment

---

[63] *See* Doc. no. 29-1, Defendant's Ex. 17 (Plaintiff's Telephone Records), at 3-4; Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE, at 245-47.

[64] *See id*. at 267-70.

[65] *See id*.  at 270-71.

[66] *See id*.  at 44-47, 270-71.

[67] *See id.*

[68] *See id*. at 50-52.

and retaliated against him for his complaints about that harassment.[69]   Shortly

thereafter, on November 21, 2007, plaintiff was terminated.  He filed a second charge

with the EEOC on January 25, 2008, alleging that his termination constituted

retaliation in violation of Title VII, and retaliation or interference in violation of the

Family and Medical Leave Act.[70]

The EEOC found "reasonable cause to believe that a violation [of Title VII]

occurred" in response to plaintiff's first EEOC charge filed on October 9, 2007.[71]  The

EEOC invited the parties to conciliate the charge, but those efforts failed.[72]  In late

2009, plaintiff received notice from the EEOC of his right to file suit based upon the

allegations contained in the first charge,[73] and plaintiff timely commenced suit based

upon those claims in *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE,

filed on October 23, 2009.[74]  *See* 42 U.S.C. § 2000e-5(f).  Plaintiff asserted a sexual

harassment claim under Title VII, interference and retaliation claims under the FMLA,

---

[69] *See* doc. no. 29-2, Vol. 2, Defendant's Ex. 8 (Plaintiff's EEOC Charges), at 2; *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 1 (Complaint) ¶ 8.

[70] *See* doc. no. 1 (Complaint) ¶¶ 8-9.

[71] *See Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 1-1 (Exhibits to Complaint), at 3 (EEOC Letter of Determination).

[72] *See id.* at 4; *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 1-1 (Exhibits to Complaint), at 5.

[73] *See* doc. no. 6 (Brief in Support of Motion to Dismiss), at 2-3; doc. no. 8 (Response in Opposition to Motion to Dismiss), at 2; *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 1-1 (Exhibits to Complaint), at 5.

[74] *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 1 (Complaint), at 1.

and state law claims for invasion of privacy, assault and battery, outrage, and negligent hiring, training, retention and supervision.[75]  This court entered summary judgment in favor of defendant on all claims asserted by plaintiff in that action, except for plaintiff's sexual harassment claim, on February 11, 2011.[76]

The EEOC did not issue plaintiff a right-to-sue letter regarding his second charge — the one at issue in the present action — until May 4, 2010,[77] more than two months after the deadline for the addition of new claims set by the scheduling order entered in plaintiff's first case, Civil Action No. CV-09-S-2156-NE.[78]  Then, on July 28, 2010, within ninety days of receiving his second right-to-sue letter, plaintiff commenced this action.[79]

## III.  DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms,

---

[75] *See id.* at 8-18; doc. no. 28 (Brief in Support of Motion for Summary Judgment), at 2; doc. no. 34 (Response in Opposition to Motion for Summary Judgment), at 1.

[76] *See Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 31 (Memorandum Opinion Granting in Part and Denying in Part Summary Judgment); *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 32 (Order Granting in Part and Denying in Part Summary Judgment); Brief in Support of Motion for Summary Judgment, at 2; Response in Opposition to Motion for Summary Judgment, at 1.

[77] Complaint, at 7.

[78] *Murrell v. Kohler Co., Inc.*, Civil Action No. CV-09-S-2156-NE, doc. no. 14 (Scheduling Order) ¶ 1.

[79] Complaint ¶ 9.

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII also prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]."  42 U.S.C. § 2000e-3(a) (alterations supplied).

## A.   *Prima Facie* **Case**

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must show in order to establish a *prima facie* Title VII retaliation claim that:  (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there is a causal connection between his protected activity and the materially adverse action suffered.  *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  "If the plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action.  If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual."  *Id.* (citation omitted).

It is undisputed that plaintiff satisfies the first two elements of a *prima facie* retaliation claim.  He engaged in the protected opposition and participation activities of filing grievances with his union concerning the alleged sexual harassment by

Shayla Bennett, lodging complaints with management officials about the alleged sexual harassment, and filing Title VII sexual harassment and FMLA charges with the EEOC.[80]   Further, he suffered the quintessential adverse employment action: termination.  The parties only dispute whether plaintiff has shown a causal connection between his protected activities and his termination, as required to satisfy the third element of a *prima facie* retaliation case.

The demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial.  At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Equal Employment Opportunity Commission v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

"Close temporal proximity between the protected activity and the adverse action

---

[80] Under the Opposition Clause of Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  Title VII's Participation Clause provides that an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id.*  The Participation Clause protects "proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  *Equal Employment Opportunity Commission v. Total System Service, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

may be sufficient to show that the two were not wholly unrelated." *Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 1095, 1119 (11th Cir. 2001) (citing *Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)); *see also*, *e.g.*, *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (holding that "a close temporal proximity between two events may support a finding of a causal connection between those two events") (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action *is* sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.") (emphasis supplied)).

Conversely, as the period of time between the protected activity and the adverse action increases, the less likely it becomes that a causal linkage between the two events will be found based upon temporal proximity alone. Indeed, as the Supreme Court has observed, the temporal gap must be "very close" in order to support the conclusion of a causal linkage. *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and also citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992), for the proposition that three- and four-month gaps, respectively, between an

employer's knowledge of protected activity and an adverse employment action are not

sufficiently close to serve as circumstantial evidence of a causal relationship between

the two events).[81]

The pertinent question in a case such as this one, where there is no evidence

directly linking plaintiff's protected activities to the termination of his employment,

is: "*How long is too long?*"  The Eleventh Circuit has held that a temporal gap of only

one month between the plaintiff's act of filing an EEOC charge alleging that her

employer denied her a sales representative position because of her sex and the

subsequent termination of the plaintiff's employment was sufficiently close to

establish a causal nexus.  *Donnellion v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.

1996) ("The short period of time . . . between the filing of the discrimination

complaint and the plaintiff's discharge belies any assertion by the defendant that the

plaintiff failed to prove causation.").  On the other hand, the Supreme Court has held

---

[81] In full text, the Supreme Court's statement in *Breeden* is as follows:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001).  *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).  Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (*per curiam*).

that a temporal gap of twenty months "suggests, by itself, no causality at all." *Breeden*, 532 U.S. at 274.

Here, plaintiff was terminated forty-three days (six weeks and one day) after he filed a charge with the EEOC alleging that defendant subjected him to sexual harassment.  The temporal proximity between the protected activity and the adverse employment action thus was sufficiently close to suggest causation.  *See, e.g., Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding a delay of seven weeks between the date on which plaintiff filed his EEOC charge and the date on which he was terminated "sufficiently proximate to create a causal nexus for purposes of establishing a *prima facie* case").

Even so, a causal chain based solely upon temporal proximity may be broken by intervening acts occurring between the protected activity and the adverse action. *See Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997) (holding that the plaintiff's failure to meet the performance standards set by the employer broke the causal connection between any protected activity and adverse employment action); *see also*, *e.g.*, *Hankins v. AirTrans Airways, Inc*., 237 F. App'x 513, 520-21 (11th Cir. 2001) (finding that the plaintiff's "intervening act of misconduct" severed the causal connection between the protected activity and the adverse employment action that occurred five days thereafter).

28

Defendant argues that plaintiff's violations of the "No-Call" policy were intervening misconduct that broke any causal chain based on temporal proximity. Plaintiff argues two grounds for contending that he did not violate the policy. First, he argues that he complied with the "No-Call" policy by "calling-off" on each of the three days defendant alleges he failed to do so and for which defendant terminated his employment. Plaintiff argues in the alternative that, in any event, he was not required to "call-off," because he was absent from work on FMLA leave.[82] The following two sections address each of those arguments in turn.

**1.      Did plaintiff's telephone calls to the "call-off" line comply with the "No-Call" policy?**

It is clear from the undisputed facts in the record that, if plaintiff was required to "call-off," he violated the "No-Call" policy on three consecutive days: November 15, 16, and 17, 2007. Plaintiff presented his telephone records for the relevant time period. While those records confirm that plaintiff, in fact, placed telephone calls to the "call-off" line on each of those days, they also show that those calls were made far more than one hour *after* plaintiff's 7:00 a.m. shift began: *i.e.*, plaintiff called at 8:24 a.m. on November 15, at 8:50 a.m. on November 16, and at 8:38 a.m. on November

---

[82] Under the FMLA, an eligible employee is entitled to up to twelve weeks of leave each year to care for a serious health condition of the employee, or the employee's child, spouse, or parent. *See* 29 U.S.C. § 2612(a)(1).

17, 2007.[83]  Defendant's "No-Call" policy defines any "call-off" not made at least one

hour *prior to the beginning of an employee's shift* as a violation of the "No-Call"

policy.[84]

       Plaintiff argues that, even if the calls were late and, thus, a violation of the "No-

Call" policy, the violations were, according to the terms of defendant's employment

policies, insufficient to result in plaintiff's termination.  Specifically, plaintiff argues:

> If the Plaintiff[']s calls to the "call-off line" were late, as the
> movant contends, the Kohler Company Policy requires assigning ½
> occurrence or absence for each incident.  If late the Plaintiff had only ½
> no call days of the required four days for termination under Kohler
> Company Policy when he was terminated.[85]

Plaintiff's argument appears to confuse the relationship between defendant's "No-

Call" and "Absence System" policies.   Defendant's "No-Call" policy is an

independent policy, providing its own requirements and grounds for termination,

although it also provides that certain lesser policy violations create absences for the

purposes of defendant's "Absence System" policy.[86]  Plaintiff is not correct when

asserting that the "No-Call" policy provides that one-half of an occurrence is to be

---

[83] *See* doc. no. 29-1, Defendant's Ex. 17 (Plaintiff's Telephone Records), at 3; doc. no. 29-1 (Plaintiff's Deposition in Civil Action No. CV-09-S-2156-NE) , at 245-47.

[84] Doc. no. 29-1, Defendant's Ex. 6 (Employee Handbook), at 5 (alteration supplied).

[85] Doc. no. 34 (Response in Opposition to Motion for Summary Judgment), at 25-26 (alteration supplied).

[86] *See* Employee Handbook, at 5.

given for calling the "call-off" telephone line late.  Rather, the policy provides that the "No-Call" policy is violated by *any* "[f]ailure to report off from work at least one hour prior to the start of the scheduled shift," and a "no-call write up" is to be given for any violation *unless* one of the exceptions applies.[87]  Neither of the exceptions under which points for violations of the "Absence System" are awarded to an employee provide that only half of an "occurrence" is given for calling late.[88]  Additionally, both of those exceptions require the employee to show up for work that same day, in order for the exception to apply.[89]

Plaintiff did not show up for work on November 15, 16, or 17, 2007, despite being scheduled to work on those days, and plaintiff called late on each of those days. Thus, plaintiff violated the "No-Call" policy on three consecutive days.

### 2. Was plaintiff on FMLA leave and, thus, not subject to the "No-Call" policy?

Plaintiff alternatively argues that he was on FMLA leave on November 15, 16, and 17, 2007 and, thus, was not required to "call-off" from work.  Defendant argues that plaintiff was *not* on *approved* FMLA leave on those dates, because he had not returned the required medical certification.  Accordingly, he *was* required to "call-off"

---

[87] *Id.*

[88] *See id.*

[89] *See id.*

from work in accordance with the "No-Call" policy.

Defendant admits that an employee who is *granted* FMLA leave in accordance with the company's policy is *not* required to "call-off."[90]  Even so, plaintiff admits that McCutcheon and Robinson reminded him that an employee is not officially entitled to FMLA leave until the medical certification form is completed by the physician and returned to defendant; and that, until that prerequisite is satisfied, the employee is required to "call-off":  *i.e.*, "I was told by Denise Robinson — and Becky [McCutcheon] to always call in.  So you have to call in, and you have to have your paperwork back in 15 days."[91]

Because plaintiff did not return the required medical certification forms until November 29, 2007, he was not on *approved* FMLA leave on November 15, 16, or 17, 2007, and was required to "call-off" on each of those days.  Thus, because it is undisputed that plaintiff committed the intervening misconduct of violating the "No-Call" policy, plaintiff cannot establish the causation element of a *prima facie* retaliation case.

---

[90] *See* Response in Opposition to Motion for Summary Judgment, at 4 ("Kohler Company policy does not require employees to telephone the call-off line when exercising leave pursuant to the Family and Medical Leave Act."); doc. no. 36 (Reply Brief in Support of Motion for Summary Judgment), at 1 (not contesting that statement of fact), and 6 ("The fact that an employee on FMLA leave is not required to call in to report his absences . . . .").

[91] *See* doc. no. 29-2, Vol. 1 (Plaintiff's First Deposition), at 41 (alteration supplied).

B.      **Legitimate, Non-discriminatory Reason and Pretext**

Even assuming that plaintiff could make out a *prima facie* retaliation case, his claim would still fail because defendant presents a legitimate, non-discriminatory reason for terminating plaintiff, and plaintiff fails to show that the asserted reason is pretextual.  After a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for terminating plaintiff. *McDonnell Douglas*, 411 U.S. at 802.  That burden is "exceedingly light." *Meeks*, 15 F.3d at 1021.  Defendant need not persuade this court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against plaintiff.  *Texas Department of Community Resources v. Burdine*, 450 U.S. 248, 254 (1981).  Nevertheless, defendant's response must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255-56.  Defendant satisfies that burden by asserting that plaintiff violated the "No-Call" policy, and presenting evidence to show that the alleged violation was the reason for the termination of plaintiff's employment.[92]

Once the employer meets its burden of articulating a legitimate, non-retaliatory reason for the challenged employment action, the presumption of retaliation drops

---

[92] *See* doc. no. 29-5 (Second Declaration of Becky McCutcheon) ¶ 8.

from the case, and the plaintiff must demonstrate that the employer's reasons are a

"'pretext for prohibited retaliatory conduct.'" *See Johnson v. Booker T. Washington*

*Broadcasting Service, Inc.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000) (quoting *Sullivan*

*v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999)).  An

employee may show pretext by demonstrating "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could find [those reasons]

unworthy of credence." *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258

(11th Cir. 2001).  Of course, pretext may also be established by demonstrating that the

employer's proffered reason is simply false.

Plaintiff's only argument on the issue of pretext is that defendant's reason for

his termination is false because he did not violate the "No-Call" policy.  As discussed

in the previous section, it is undisputed that plaintiff violated the "No-Call" policy.

Accordingly, plaintiff has failed to present evidence to show that defendant's asserted

reason for his termination is pretextual.

### IV.  MOTION TO STRIKE

Defendant moves to strike from the record all, or in the alternative, portions, of

the affidavits of Casi Sims and Dexter Smith submitted by plaintiff in support of his

brief in response to the motion for summary judgment.[93]  As consideration of those affidavits was not necessary to the resolution of defendant's motion for summary judgment, defendant's motion to strike is due to be denied as moot.

## V.  CONCLUSION AND ORDER

Upon consideration of the foregoing issues, defendant's motion for summary is due to be, and hereby is, GRANTED.  All claims asserted by plaintiff are DISMISSED with prejudice.  Defendant's motion to strike is DENIED as moot.  The Clerk is directed to close this file.  All costs are taxed as paid.

DONE this 15th day of June, 2012.

_____
United States District Judge

---

[93] *See* doc. no. 37 (Motion to Strike), at 1.